·Ernest L. Smith *et al. vs.* Arthur I. Hartwell *et al.*

MAY 26, 1947.

Present: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Condon, J.   This is a bill in equity for the dissolution of a partnership and for an accounting.  The cause was heard in the superior court on bill, answer, replication and proof, and resulted in the entry of a decree adjudging the respondents Arthur I. Hartwell and Dora M. Hartwell indebted to the complainants Ernest L. Smith and Mildred P. Smith in the sum of $2403.98.  From that decree the respondents have appealed to this court.

The trial justice found that the partnership continued in existence until the filing of this bill of complaint on December 20, 1944. Respondents contended that, by the conduct of the parties, it had actually been dissolved at the very latest on September 15, 1944, on which date complainants and respondent Arthur I. Hartwell met in the office of Joseph H. Coen, attorney for the partnership, and made an accounting to him of their respective receipts and expenditures in connection with the business of the partnership. Mr. Coen will hereinafter be referred to as Coen. The basic question raised by the respondents' appeal is as to which of those dates is the date of dissolution. There are several other subsidiary questions which will be noticed after the main question has been considered.

The complainants contended here, as they did successfully in the superior court, that the meeting in Coen's office was not for the purpose of an accounting and that the partnership continued down to the filing of their bill of complaint. They further contended that the evidence shows that there was no conduct by the partners prior thereto reasonably tending to raise the inference that the partnership was at an end. They also argued that the findings of the trial justice are supported by a preponderance of the evidence and, therefore, cannot be found by this court to be clearly wrong.

The evidence shows that, on November 10, 1943, the complainants and the respondents entered into a partnership agreement in writing for the purpose of engaging in the business, under the name of "United Machine Facilities", of "facilitating the procurement of contracts and in acting as advisory counsel in engineering, designing, planning, expediting, management and in servicing of contracts procured for the manufacture of aircraft parts and equipment and machinery generally, particularly with reference to government contracts." The agreement further provided that all partners would devote their abilities and entire time to the partnership and would refrain from conduct which would "in any manner affect the credit and reputation of the part-

nership", and that all were to share equally in the assets, profits and losses of the partnership.

After entering into the agreement the partners opened a business office in Providence, in this state, and divided the conduct of the business in the following manner: Smith was to find local machine shops qualified to do the work that the partnership was organized to handle and to make a list of these shops together with a description of their respective facilities for performing such work; Hartwell was to contact corporations that had government contracts for manufacturing aircraft parts and equipment and to solicit from them mechanical work to be done under subcontract by the shops listed by Smith; and Mrs. Smith and Mrs. Hartwell were to attend to the general office details of the business. Work thus obtained by the partnership for any shop was to result in such service fee or charge as might be agreed to between the partnership and said shop, and this was to be paid by the shop and not by the government contractor.

Each partner, except Mrs. Hartwell, performed services for the partnership in accordance with the above arrangement. Smith contacted a large number of shops and listed their facilities in a brochure which he had compiled in the name of the partnership. Hartwell traveled extensively in the northeastern and central states contacting corporations that had government contracts for such work as the partnership was interested in, and in this manner he obtained two substantial contracts, one with Bell Aircraft Corporation and the other with Morse Chain Company, which were ultimately performed by the Armitage Machine Company, which was owned by George H. Armitage, of Providence, and was one of the shops listed in the partnership brochure. Mrs. Smith attended to the clerical work for the partnership until some time in April, 1944, when its office was closed by the landlord for failure by the partnership to pay the rent.

None of the partners invested personal funds in the business. The partnership office was rented and equipped on the credit of the partnership, payment for the telephone service

being personally guaranteed by Hartwell. However, the partnership never received money from any source and no books of account were ever kept. After the partnership office was closed in April, the partnership debts appear to have been paid by Hartwell, either with his own funds or with funds which he had received from Armitage, at whose shop he was then working. Some time prior to March 1, 1944, a dispute arose between Hartwell and Smith, the latter complaining that Hartwell could not be contacted while he was on the road. Smith claimed that as a result the partnership lost business. Hartwell on the other hand appears to have become dissatisfied because he felt that he was doing the work and spending his own funds and that Smith was accomplishing nothing.

Largely as a result of such disagreement, Hartwell discontinued his trips in search of business for the partnership and, on or about March 1, 1944, went to work for Armitage, assisting him in the performance of the contract with the Morse Chain Company, which the partnership, through Hartwell, had obtained for him. It was understood by the partners that Hartwell would be engaged there at least 90% of his working time. It later developed that he gave his entire time to this work and that after the Morse contract was canceled, a short time before September 15, 1944, he continued working for Armitage and received compensation at the annual rate of $10,000.

During that period Smith considered that the partnership was still in existence and continued his efforts in its behalf but no financial benefit resulted therefrom to the partnership. Finally Smith appears to have concluded that Hartwell had, in effect, deserted the partnership and, accordingly, he wrote to Coen and complained against Hartwell, claiming that because of his neglect of the partnership he should be made to pay him, Smith, $10,000 for the damage done to his, Smith's, partnership interest.

A carbon copy of that letter, dated April 24, 1944, was admitted in evidence as an exhibit. Smith therein charged

Hartwell with not living up to the partnership agreement; breaking all its clauses; collecting partnership funds without authority and subjecting them to his own use; and with doing nothing for the benefit of the partnership. He then went on to accuse Hartwell of fraudulently agreeing with Armitage to deprive the partnership of the benefit of the Bell Aircraft Corporation and the Morse Machine Company contracts. He concluded the main body of this letter as follows: "I will anxiously await your decision as to what action should be taken against this Man."

Moreover, he added a postscript thereto which, if anything, is even more indicative of his intention to have no more to do with Hartwell. It reads as follows: "My time is worth money and I have devoted 100% of it in my connection with Hartwell since September 1943 to date. I have fulfilled my part of the contract and still have the connections to turn out a production of $500,000 per month. An inexperienced person with sales ability by properly contacting the proper Buyers and Concerns could sell these Facilities on this market and the existing market. Hartwell never had any such intentions. He used me for a tool to get himself a job He got around Armitage got control of the Bell Aircraft money and the Morse Chain and left me holding the bag. He should be made to settle for the damage and a very reasonable sum of $10,000 which is nothing to what it should be. His policy is this kind of trickery and he has got away with it. He will cry baby the same as he did saturday and has done this with others, but I say go after him."

It does not appear that any further action was taken as a result of that letter by either Smith or Coen. Nevertheless Smith appears to have continued in the same frame of mind and to have been determined to obtain a settlement from Hartwell, for three months later, not having been able in the meantime to contact Hartwell, he retained independent counsel who sent Coen a letter demanding a hearing before him as arbitrator, in accordance with a provision of the partnership agreement, of the dispute between Smith and

Hartwell at which, the letter stated, "a full and complete statement of the matters in dispute" would be submitted for his decision. A copy of that letter, dated August 1, 1944, was introduced in evidence by complainants as an exhibit.

As a result of that letter a meeting was held in Coen's office on September 15, 1944 at which the Smiths, their attorney John M. Booth, and Hartwell were present. At that meeting Hartwell and Smith presented a full account of their respective receipts and expenses. Apparently no decision was reached at that time, but the day before the hearing in the superior court a written report by Coen was handed to Hartwell and a copy was given to Smith's counsel. That report was admitted in evidence as respondents' exhibit, over the objection of the complainants. It shows, among other things, credits in favor of Hartwell totaling $6779.08, and it charges him with partnership receipts of $4262. Smith is charged therein with the receipts from two small contracts amounting to $145.19.

Whether the hearing before Coen which resulted in that report was an accounting is in dispute, but the testimony seems to show that Coen, Hartwell and Smith so considered it. On cross-examination Smith testified: "Q. What sort of meeting were you at? What were you discussing? A. Well, that came up. We discussed it. Q. It was a partnership expense, wasn't it? A. Yes. Q. In other words, it was an accounting between the partners? A. Yes, that is right. Q. What was the purpose of an accounting at this time? A. Because we never could get an account from Hartwell." Also, "Q. I am trying to bring out from you whether or not Mr. Hartwell's expense account was one of the items of dispute which were being talked about at the meeting at Coen's office. Now, was it or was it not? A. No. Q. It was not? A. The purpose of that meeting was for an accounting."

Hartwell testified: "Q. You say that you had made the statement at the meeting that it was your understanding—one of the purposes of your being there was a dissolution?

A. For an accounting and a dissolution. Q. An accounting and a dissolution? A. That is correct, sir." .

Coen testified concerning the notice of the meeting in his office as follows: "Q. Were there any limitations placed by you upon any of the partners as to what should be covered at the hearing? A. No, there was not. Q. And what was the nature of the hearing as it developed after you opened it? A. There was a presentation by both sides of the complete expenditures and receipts that had been made by them or had been received by them. Q. Was it in the nature of an accounting? A. I think it was." And further with reference to his report he testified: "Q. Were all the figures which were presented at that hearing in your office set forth in the paper marked 'Respondents' Exhibit 1 for Identification'? A. All the figures that are in this report, this Exhibit 1 for Identification, were furnished to me by Mr. and Mrs. Smith and Mr. Hartwell. Q. As far as you know have you omitted anything from that report which was presented to you at that hearing? A. I have not. Q. Would you say that that is a complete statement of the figures which were presented to you at the hearing by the parties? A. It is, yes."

With reference to the report he testified on cross-examination as follows: "Q. Does this report here in any way purport to show an indebtedness due as between the partners in any way whatsoever? A. No. Q. It is not an accounting, then? A. I don't think it is an absolute accounting, no. This report shows claims made by the different partners as to what each one had received and what each one had expended or become obligated to expend. And it also shows certain items of expense that had been incurred by the partnership as a partnership, without regard to which one of the partners incurred it." It is apparent from those responses that the witness did not admit that the report was "not an accounting" but merely that it was not complete in one aspect, namely, as to which partner was to be credited with the payments which had been made of certain expenses incurred by the partnership or for its benefit.

Throughout the transcript there are other indications that support the respondents' contention that this partnership had definitely come to an end on or before September 15, 1944, and that on that date, at the insistence of complainant Ernest L. Smith, there was an accounting. Based on those indications and on the testimony and exhibits above discussed, we are of the opinion that the trial justice was clearly wrong in finding that the partnership had continued beyond that date. We are further of the opinion, however, that the evidence does not clearly show that Hartwell was free to devote his time and ability before that date to his personal business. He must, therefore, be held to have been working for the partnership until September 15, 1944; and all money which he received by salary checks from Armitage to that date must be credited to the partnership. But he is entitled to be allowed a credit in his own behalf of all items shown in the Coen report amounting to $3064.73 plus his automobile and hotel expenses of $3714.35, amounting in all to $6779.08. We think he must also be charged with the $1644 which he testified he credited to the partnership as a receipt from Armitage in settlement of the Bell Aircraft Corporation contract.

The trial justice found that Armitage had paid Hartwell by checks an amount of $6100.45, but this included checks received by Hartwell down to December 31, 1944, inclusive. By subtracting $1758.24, the total of all checks received after September 15, 1944, the amount of the checks to be credited to the partnership is reduced to $4342.21. The trial justice failed to credit Hartwell with the sum of $3064.73 found in the Coen report. In view of the testimony of Coen and Hartwell concerning the items which add up to that sum in the report, and the fact that the report itself is in evidence as an exhibit, we think that Hartwell is entitled to be credited with such sum.

If we adopt the trial justice's method of accounting as set out in his rescript and amend it in accordance with the above conclusions, it will appear as follows:

Paid by Armitage to Hartwell sums totaling .. $ 650.00
   (complainants' exhibit F)
Paid by Armitage to Hartwell sums totaling .. 1200.00
   (complainants' exhibit E)
Salary checks paid by Armitage to Hartwell .. 4342.21
   (complainants' exhibit G)

                      $6192.21

From this should be taken Hartwell's hotel
   and miscellaneous expenses of ....$2244.35
   and mileage on two Lincoln cars  · 1470.00

                      $3714.35
Hartwell's other payments for the partnership
   as shown in Coen's report ....... ... ... 3064.73

                      $6779.08

Since we are of the opinion that Hartwell must account for the sum of $1644 which he received from Armitage in settlement of the Bell Aircraft Corporation contract, that amount should be added to the above-mentioned sum of $6192.21, which would make a total of $7836.21 chargeable to Hartwell for the benefit of the partnership. Subtracting the above-mentioned amount of $6779.08 from $7836.21 would leave a remainder of $1057.13, which represents a partnership profit, one half of which, $528.56, must be paid by the Hartwells to the Smiths. This represents a final accounting, assuming that ·there are no outstanding claims against the receiver who was appointed at the time this bill of complaint was brought.

Before concluding, we may observe that there was another item of $3000, which Smith appears to have received from Armitage in discontinuing this bill of complaint against him. Respondents contend that this sum was paid by Armitage only as a result of a claim which Smith made against him in relation to the partnership's interest in the Bell Aircraft Corporation and the Morse Machine Company contracts, and should, therefore, be considered as partnership funds in

the hands of Smith. In view of the fact that we have held that the partnership ceased on September 15, 1944, and that such sum was received after that date and after the bill of complaint was brought, we cannot agree with that contention. On the contrary, we are of the opinion that it must be deemed to be a settlement with Smith individually in the nature of damages for the alleged fraudulent interference by Armitage with the Smiths' contract with the Hartwells, as set out in the bill of complaint; and that such settlement inured solely to the benefit of the Smiths.

The respondents' appeal is sustained, the decree appealed from is reversed, and on June 2, 1947 the parties may present to this court a form of decree, in accordance with this opinion, for entry in the superior court.

*John M. Booth,* for complainants.

*James L. Taft,* for respondents.